810

JUDY M. LAWRENCE, Plaintiff-Appellant, *v.* RICHARD T. LAWRENCE, Defendant-Appellee.

First District (5th Division)   No. 79-1091

Opinion filed July 18, 1980.

Joel S. Ostrow, of Chicago, for appellant.

Timothy M. Sullivan, of Pope, Ballard, Shepard & Fowle, of Chicago, for appellee.

Mr. PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

This is an appeal by Judy Lawrence (plaintiff)[1] from the denial of her petition for a finding that Richard Lawrence (defendant) was not the father of one of her children (Brandon).

Defendant was granted a divorce from plaintiff in 1973, with a decretal finding that Brandon Lawrence was the child of the parties. In 1974, defendant petitioned to amend the decree—asking, among other things, that plaintiff (who had custody of Brandon and was then remarried to Fred Ramos) be enjoined from telling Brandon that Ramos was his father. After a hearing on the petition, an order was entered in 1975 by agreement of the parties which, in pertinent part, directed that the question of his fatherhood was not to be raised with Brandon and that plaintiff was not to deny that Richard was the father of Brandon.

It appears that Ramos was deceased when plaintiff, in a separate proceeding and without notice to Richard, obtained an order in 1976 changing Brandon's last name from Lawrence to Ramos. When defendant learned of the name change, he petitioned for a rule on plaintiff to show cause why she should not be held in contempt for failure to comply with the 1975 order and for the vacatur of the 1976 order changing Brandon's name.

In a counterpetition, plaintiff stated in pertinent part that at the time of the divorce decree in 1973 and at the time of the 1975 order, she had been "repeatedly threatened by Richard if she attempted to establish that Ramos was the father of Brandon" and that "under the duress of said repeated threats" she was coerced into not making any attempt to establish that Ramos was the father of Brandon. She asked (1) that the judgment pertaining to the paternity of Brandon be set aside and that the court find that defendant was not his father; (2) that a ruling to show cause

---

[1] Numerous petitions were filed by both parties and, to avoid confusion, we will identify the parties as plaintiff and defendant rather than as petitioner and respondent.

issue for his failure to pay child support and maintenance; and (3) that defendant be barred visitation rights because Brandon was not his child.

At the hearing on the petitions, there was testimony by plaintiff that she had sexual relations with Fred Ramos beginning in 1963 which included several occasions about nine months prior to the birth of Brandon; that on the day Brandon was born, and also one week later, defendant said that the child did not look like him and stated, "If this child is not mine, so help me, you will be sorry for this"; that she answered that Brandon was his child because she was afraid that he would hurt her or the child, since he had struck her once before; that immediately prior to their 1973 divorce, defendant said that he would kill her if she was lying to him about the paternity of Brandon; that after the divorce, when Brandon was two years old, she told defendant that Ramos was the child's father; that she told him about the name change a couple of weeks after it occurred; and that Brandon was enrolled in school as "Brandon Ramos." On cross-examination, she testified that after the divorce decree, defendant had regular visitations with Brandon; that he "pretty much" saw or requested to see the child on almost all weekends; and that she had sexual intercourse with both Ramos and defendant in the year prior to Brandon's birth.

It was the testimony of 8-year-old Brandon that his name was "Brandon Ramos" and that, when visiting defendant, Brandon calls him "Dad," but when defendant comes to his mother's house, Brandon calls him "Dick."

The significant testimony of defendant was that he had sexual intercourse with Judy in the year prior to Brandon's birth; that he visited Brandon regularly on a weekly basis after the decree was entered until the petitions were filed in November 1978—after which plaintiff did not permit Brandon to visit him on a regular basis; and that he had never threatened plaintiff.

The trial court entered an order finding, in substance, that there was an insufficient showing of duress; that plaintiff was estopped from challenging paternity; that she was not entitled to blood tests of defendant and Brandon (she had requested them during the hearing); and that defendant was the father of Brandon. The order also directed Judy to change the child's name back to Brandon Lawrence. This appeal is from that order.

## Opinion

In her briefs here, plaintiff states the issue on appeal to be whether the trial court "erred by denying Brandon the right to the establishment of his paternity and identity." We note, however, that the trial court made no ruling denying any such right and, indeed, the record discloses no

question was raised in that regard. As pointed out above, the trial court had found in 1973 that Brandon was the child of the parties and had ordered plaintiff in 1975 not to deny that defendant was Brandon's father. The petition of defendant with which we are concerned in this appeal asked that plaintiff be held in contempt for noncompliance with the 1975 order and that the 1976 change of name order be set aside. In her counterpetition, plaintiff asserted that any statements she had made that defendant was the father of Brandon were untrue because made under duress and that, in fact, Ramos was the biological father. She prayed "[t]hat the Judgment pertaining to paternity of Brandon Ramos be vacated and set aside, and that the Court finds RICHARD T. LAWRENCE not to be the father of BRANDON DANIEL RAMOS, terminating all parental rights." She asked also that defendant be barred further visitation rights on the ground that Brandon was not his child or, alternatively, that a rule to show cause be entered against him for failure to pay maintenance and child support.

In a memorandum of law filed in the trial court and at the hearing on the petitions of the parties, plaintiff took the position that the court should have vacated the paternity findings in the 1973 decree and the 1975 order because they were entered on the basis of statements made by her under duress. The trial court held that there was an insufficient showing of duress to justify vacatur of those findings.

We thus consider the issue on appeal not to be, as plaintiff asserts, whether the trial court improperly refused Brandon "the right to establish his paternity and identity" but, rather, whether the trial court properly denied vacatur of the prior paternity findings.

■■ In this regard, because plaintiff's counterpetition was filed in 1978 and sought vacatur of the 1973 and 1975 findings as to paternity, plaintiff agrees that it should be treated as a petition under section 72 of the Civil Practice Act (Ill. Rev. Stat. 1977, ch. 110, par. 72). That section provides in part that the petition "must be filed not later than 2 years after the entry of the order or judgment" and that "[t]ime during which the person seeking relief is * * * under duress * * * shall be excluded in computing the period of 2 years." In plaintiff's counterpetition, the only allegations concerning duress were that at the time of the 1973 decree and the 1975 order she was "repeatedly threatened" by defendant if she were to attempt to establish that he was not the father of Brandon, and that "under the duress of said repeated threats" she made no attempt to establish that defendant was not the father of Brandon. While she testified that she was threatened at the time of the 1973 decree and it might be assumed that those threats continued up and through the order of 1975, she makes no allegation as to any threats or duress after that 1975 order and, as the petition in question was filed more than two years thereafter—

in October 1978, it thus appears that the petition should have been denied as not having been filed within two years. In any event, while the entry of an order obtained by duress is a proper ground for relief under section 72 (*People v. Stewart* (1978), 66 Ill. App. 3d 342, 383 N.E.2d 1179, *cert. denied* (1979), 441 U.S. 907, 60 L. Ed. 2d 376, 99 S. Ct. 1998; *In re Sims* (1975), 30 Ill. App. 3d 406, 332 N.E.2d 36), the burden of proving such duress is upon the person asserting it (see *Kohler v. Sears Roebuck & Co.* (1977), 56 Ill. App. 3d 157, 371 N.E.2d 1044; *Collins v. Prestige Casualty Co.* (1977), 54 Ill. App. 3d 762, 370 N.E.2d 103), and, because the credibility of the witnesses and the weight to be given their testimony rests with the trier of fact, its finding will not be disturbed on review unless manifestly against the weight of the evidence (*In re Application of County Collector (Howell v. Edelen)* (1978), 66 Ill. App. 3d 437, 383 N.E.2d 1224; *In re Application of County Collector (Diegel v. Burroughs)* (1972), 7 Ill. App. 3d 124, 287 N.E.2d 81).

In this regard, we note that:

" 'Duress has been universally defined as a condition which exists where one is induced by the unlawful act of another to * * * perform or forego an act under circumstances which will deprive him of the exercise of his free will. There must be such compulsion affecting the mind as shows that the [act] * * * was not the voluntary act of the maker." *People ex rel. Drury v. Catholic Home Bureau* (1966), 34 Ill. 2d 84, 92, 213 N.E.2d 507, 511, quoting *Stoltze v. Stoltze* (1946), 393 Ill. 433, 442, 66 N.E.2d 424, 428.

■■ Plaintiff asserted in her verified complaint for divorce, and also testified at the hearing thereon, that three children (including Brandon) were born of her marriage with defendant and that she had been a true, faithful and affectionate wife. So far as the record presented here is concerned, it was in her November 1978 counterpetition she first made statements that defendant was not Brandon's father and that she had been coerced into not raising the parenthood question because of "repeated threats" by defendant. Further, the only testimony she gave in that regard was at the hearing on those 1978 petitions, as follows—that on February 13, 1971, the day Brandon was born, defendant said, "If this child [Brandon] is not mine, so help me, you will be sorry for this"; that a week later he said again, "So help me, if he is not mine, you will be sorry"; that a few weeks later he asked "Are you telling me the truth, that this child is mine?" that in June 1972, when her complaint for divorce was filed, he said, "I will kill you if you are telling me a lie [that he was the father of Brandon]"; that after the February 1975 order, she said (without mentioning the date) she talked to defendant about Brandon's parenthood, and defendant said, "I can't believe you would do this to me * * * I will

get you for it." Then, in November or December 1978, he said again, "I will get you for it."

The record discloses no other reference to any threats or indications of duress in any other form. Moreover, no other person testified to any such threats by defendant, and defendant denied making any.

It is also noted that plaintiff testified she lied when she stated in her verified complaint for divorce and in the hearing thereon that defendant was the father of Brandon. Her credibility was further in question from her testimony (1) that she did not inform defendant that Brandon was not his child until after the divorce, which was contrary to her statement in a memorandum of law filed with the court that she informed defendant prior to the divorce; (2) that she told defendant about the name change a couple of weeks after it occurred, whereas, in her response to defendant's petition, she asserted that the name change was with defendant's consent; and (3) that testimony she gave as to defendant seeing Brandon on a regular basis after the divorce was contrary to a statement in her memorandum that defendant ceased to visit Brandon during her marriage to Ramos.

■ From the totality of the circumstances, we cannot say that the trial court's finding that there was insufficient evidence of duress to justify vacatur of the prior findings as to parenthood was against the manifest weight of the evidence and, inasmuch as blood tests would have no relevance as to the issue of duress, plaintiff's request therefor was properly denied.

■ Plaintiff also asserts error in the direction that she restore the child's name to Brandon Lawrence. Initially, she argues that "An Act to revise the law in relation to names" (Ill. Rev. Stat. 1977, ch. 96, pars. 1-3) does not require that notice of a name change be sent to any person. We consider this argument as irrelevant, since defendant's petition is premised upon the violation of the prior orders rather than upon nonconformity to the statute. Moreover, while she also argues that the change of Brandon's name did not violate the prior orders because it did not *per se* question his parentage, we note that this argument was not presented to or considered by the trial court and cannot be raised for the first time on review. (*Kravis v. Smith Marine, Inc.* (1975), 60 Ill. 2d 141, 324 N.E.2d 417.) In any event, it is clear that plaintiff's right to petition for the change of Brandon's name arises solely because she had legal custody of him (Ill. Rev. Stat. 1977, ch. 96, par. 2); that custody was granted by the 1973 decree and reaffirmed in the February 1975 order in which the court also retained jurisdiction of the case and directed that the parties were not to raise the question of fatherhood to Brandon, were to avoid the subject at all times, and that plaintiff was not to deny that defendant was Brandon's father.

Nevertheless, plaintiff petitioned in the chancery division for the change of name, with no notice to defendant and assumedly with no notice to the court hearing the petition that the domestic relations division had retained jurisdiction. In the light thereof, we believe the trial court properly found that plaintiff "circumvented the jurisdiction of the domestic relations division by securing the name change in a proceeding filed in the chancery division."

Plaintiff also posits that the trial court here did not consider the best interests of Brandon in ordering her to restore his original family name. She argues that:

> "[I]n *Solomon v. Solomon*, 5 Ill. App. 2d 297, 125 N.E.2d [675] (1955), the Court distinctly held that even though a noncustodial parent has the right to object to a name change of a minor child, the determination of such objection must be in accordance with the child's best interests. Here, as in every other aspect of the case, the lower court completely ignored the child's interests in favor of the sensitivities of Respondent."

In *Solomon*, plaintiff was granted a divorce and custody of a minor child. After a remarriage, she petitioned to change the name of the 17½-year-old child to that of his foster father. Her former husband obtained an injunction restraining her instituting any such action during the child's minority. That order was affirmed on appeal, with the court stating:

> "In determining whether or not any restraint should be put upon plaintiff's action in aiding the minor child to change his name, of course the first and most important consideration before the trial court should be the welfare of the child. The matter is within the discretion of the court." *Solomon v. Solomon* (1955), 5 Ill. App. 2d 297, 301-02, 125 N.E.2d 675, 678.

Here, we believe plaintiff's argument that the trial court did not consider Brandon's best interests is without merit, as our examination of the record discloses that, on many occasions, the trial court indicated—indeed, expressly stated—that the important consideration in its rulings was the best interests of Brandon, and we note no determination in that regard was made in the change of name proceeding. We see no abuse of discretion in the order directing plaintiff to restore Brandon's original name.

For the reasons stated, we affirm the order appealed from.

Affirmed.

LORENZ and WILSON, JJ., concur.